## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ASHLEY PARNELL, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | )   Case No. 22-CV-0232-CVE-SH |
| | ) |
| TAMIKA WHITE, | ) |
| | ) |
| Respondent. | ) |

## OPINION AND ORDER

Petitioner Ashley Parnell, an Oklahoma prisoner appearing through counsel, petitions for a writ of habeas corpus, under 28 U.S.C. § 2254, to challenge her custody under the criminal judgment entered against her in Tulsa County District Court Case No. CF-2008-1607.  Respondent Tamika White moves to dismiss the petition, arguing that Parnell failed to file it within the one-year statute of limitations prescribed in 28 U.S.C. § 2244(d)(1) and, in the alternative, that Parnell did not exhaust available state remedies, as required by 28 U.S.C. § 2254(b)(1).  Having considered the petition (Dkt. # 2), the motion to dismiss (Dkt. # 20) and brief in support (Dkt. # 21), the response in opposition to the motion to dismiss (Dkt. # 24), the state court record as supplemented by Parnell's newly discovered evidence, and applicable law, the Court grants respondent's motion and dismisses the petition as barred by the one-year statute of limitations and, in the alternative, for failure to exhaust available state remedies.

### BACKGROUND

In 2009, a Tulsa County jury convicted Parnell of first-degree murder, in violation of OKLA. STAT. tit. 21, § 701.7, for causing the death of her boyfriend's 23-month-old son, S.R.  Dkt. # 21-

1, at 1; Dkt. # 21-4, at 9-11; Dkt. # 33-21, Original Record ("O.R.") vol. 1, at 19 [14].[1]   As recommended by the jury, the trial court sentenced Parnell to life imprisonment.  Dkt. # 21-1, at 1.  The Oklahoma Court of Criminal Appeals ("OCCA") affirmed Parnell's judgment and sentence on August 13, 2010.  Dkt. # 21-3.  Nearly six years later, Parnell filed two motions in state court seeking postconviction or other collateral review.  Dkt. ## 21-5, 21-6.  The state district court:  (1) construed one motion as a request for sentencing modification, under OKLA. STAT. tit. 22, § 982a, and denied the motion; and (2) construed the other motion as an application for postconviction relief, under OKLA. STAT. tit. 22, § 1080, and denied the application.  Dkt. ## 21-7, 21-8.

In 2017, Parnell filed a second application for postconviction relief, alleging that the convicting court lacked jurisdiction, under the rationale articulated in Murphy v. Royal, 875 F.3d 896 (10th Cir. 2017), because she is Indian and committed murder in Indian country.  Dkt. # 21-9.  The state district court denied the application as premature, noting that the Murphy decision was not final because a petition for a writ of certiorari had been filed with the United States Supreme Court in that case.  Dkt. # 21-10.[2]

Following the Supreme Court's decisions in McGirt v. Oklahoma, 140 S. Ct. 2452 (2020), and Sharp v. Murphy, 140 S. Ct. 2412 (2020), Parnell, through counsel, filed a third application for postconviction relief in 2020, alleging that, pursuant to the dictates of McGirt, the convicting

---

[1] In most instances, the Court's citations refer only to the CM/ECF header pagination.  However, citations to the original record and transcripts of state court proceedings refer to the CM/ECF header pagination and, in brackets, refer to the original pagination if the original pagination differs from the CM/ECF header pagination.

[2] The state district court's docket additionally contains an August 3, 2020, entry for an application for postconviction relief.  Dkt. # 21-4, at 22.  Respondent's counsel asserts that upon "contact[ing] the clerk's office to obtain a copy of the document, [she] was informed that the clerk's office had no such document in its possession."  Dkt. # 21, at 9 n.3.  Parnell does not mention this application in her petition or in her response to respondent's dismissal motion.

court lacked jurisdiction.[3]  Dkt. # 21-13.  On September 10, 2021, the state district court found

that Parnell has some degree of Indian blood, that she was first enrolled as a citizen of the Quapaw

Nation in 1992, and that she committed the crime for which she was convicted within the

boundaries of the Muscogee (Creek) Nation Reservation.  Dkt. # 21-14, at 3-4.  Nonetheless,

relying on the OCCA's decision in State ex rel. Matloff v. Wallace, 497 P.3d 686 (Okla. Crim.

App. 2021) ("Wallace"), the state district court held that the McGirt decision did not apply

retroactively to Parnell's conviction and denied relief.  Id. at 4-7.  Parnell, through counsel, filed a

notice of appeal on September 30, 2021.  Dkt. # 21-15.  Parnell filed a pro se petition in error in

the OCCA on November 18, 2021.  Dkt. # 2-2, at 268-77.[4]  The OCCA declined jurisdiction and

dismissed the appeal on December 13, 2021, finding that Parnell filed her petition in error nine

days after the expiration of the sixty-day period for filing a petition in error.  Dkt. # 21-16, at 2-3.

---

[3] In McGirt, the Supreme Court held that Congress has not disestablished the Muscogee (Creek) Nation Reservation and that, as a result, the land within the historical boundaries of that reservation is "Indian country," as defined in 18 U.S.C. § 1151(a).  McGirt, 140 S. Ct. at 2459-60, 2474.  This means that certain crimes committed by Indian defendants within the Muscogee (Creek) Nation Reservation must be prosecuted in federal court under the Major Crimes Act, 18 U.S.C. § 1153.  Id. at 2459, 2479.  In Sharp v. Murphy, 140 S. Ct. 2412 (2020), the Supreme Court relied on its decision in McGirt to summarily affirm the Tenth Circuit's decision in Murphy.  Sharp, 140 S. Ct. at 2412.

[4] The petition in error was stamped as filed in the OCCA on November 18, 2021.  Dkt. # 2-2, at 268.  The petition in error filed in the OCCA also contains a second stamp indicating that a "clerk's office," with no specific court designation, received the petition in error on November 1, 2021.  Dkt. # 2-2, at 268.  Parnell filed a copy of the petition in error in state district court on November 2, 2021.  Id. at 278-88.  That court docketed the petition in error as an "appeal from denial of app for postconviction" and a copy was provided to the district attorney and the judge. Dkt. # 21-4, at 24. The copy filed in the state district court does not have the generic "clerk's office" stamp that is reflected on the copy of the petition in error filed in the OCCA.  Thus, it is not clear from the record whether the generic "clerk's office" stamp indicates that any state court received a copy of the petition in error on November 1, 2021.

Parnell, through counsel, then filed her federal habeas petition on May 26, 2022, identifying two grounds for relief:

> Ground One:   Pursuant to the United States Supreme Court's holding in <u>McGirt v. Oklahoma</u>, which contains a new procedural rule that must be applied retroactively and, therefore, should excuse any procedural default or untimeliness, the Oklahoma state courts lacked jurisdiction over this case and the conviction is therefore invalid.

> Ground Two:   Newly discovered evidence demonstrates that [S.R.'s] death was not caused by inflicted trauma and, as such, no reasonable juror would have convicted Ms. Parnell.

Dkt. # 2, at 12, 16.[5]

## DISCUSSION

Respondent contends that the applicable one-year statute of limitations bars relief as to the Indian-country jurisdiction claim because:  (1) Parnell filed the petition well beyond the one-year limitation period provided in 28 U.S.C. § 2244(d)(1)(A); (2) <u>McGirt</u> did not provide a later commencing one-year limitation period under 28 U.S.C. § 2244(d)(1)(C); and (3) Parnell has not presented a credible actual innocence claim.  Dkt. # 21, at 2, 18-27.  Alternatively, respondent contends that even if Parnell could overcome the untimely filing of the petition, dismissal is appropriate because Parnell did not exhaust available state remedies, as required by 28 U.S.C.

---

[5] In this opinion and order, the Court refers to the ground one claim as the Indian-country jurisdiction claim and refers to the ground two claim as the actual innocence claim.  However, as further discussed below, the Supreme Court has "not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence."  <u>McQuiggin v. Perkins</u>, 569 U.S. 383, 392 (2013).  The Court thus understands Parnell to assert the actual innocence claim only as a basis to overcome the untimeliness of the Indian-country jurisdiction claim.  <u>See id.</u> ("[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief.").

§ 2254(b)(1), as she did not fairly present the Indian-country jurisdiction claim to the OCCA through a postconviction appeal after the state district court denied relief.  Id. at 2, 27-29.

Parnell argues that dismissal is not appropriate because: (1) McGirt should apply retroactively; (2) the one-year statute of limitations should not apply to "shield from review a judgment by a court lacking jurisdiction"; (3) even if the statute of limitations applies, her actual innocence claim permits this Court to reach the merits of her untimely Indian-country jurisdiction claim; and (4) she should not be required to exhaust available state remedies as to the Indian-country jurisdiction claim because "[n]o amount of comity can require a petitioner to first present her claim to a state court lacking jurisdiction over her case before presenting that claim to a federal court."  Dkt. # 24, at 5-11.

## I.   Exhaustion of available state remedies

Under 28 U.S.C. § 2254(b)(1), a habeas petitioner must "provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon h[er] constitutional claim."  Anderson v. Harless, 459 U.S. 4, 6 (1982) (quoting Picard v. Connor, 404 U.S. 270, 276-77 (1971)).  To satisfy the exhaustion requirement, the petitioner "must pursue [her claim] through 'one complete round of the State's established appellate review process.'"  Selsor v. Workman, 644 F.3d 984, 1026 (10th Cir. 2011) (quoting O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999)).  And the petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if [s]he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c).

Respondent argues, and the Court finds, that Parnell did not fairly present the Indian-country jurisdiction claim because she did not perfect a postconviction appeal following the denial of her third application for postconviction relief and, further, that state remedies remain available

to Parnell.  Dkt. # 21, at 28.  In its order declining jurisdiction, the OCCA referred to its procedural rule that permits a petitioner to seek an out-of-time postconviction appeal and stated, "If Petitioner feels she has been denied a post-conviction appeal through no fault of her own, she may seek the appropriate relief with the District Court."  Dkt. # 21-16, at 2-3; see Doshier v. Oklahoma, 67 F. App'x 499, 501 (10th Cir. 2003) ("We note that [the petitioner] apparently still has state remedies available to him, as the OCCA advised him that he could seek an out-of-time appeal through an application for post-conviction relief in state district court.").  Because a state remedy remains available to her, this Court cannot deem the Indian-country jurisdiction claim exhausted.  28 U.S.C. § 2254(c).

When exhaustion is raised as an affirmative defense, the petitioner "bears the burden of proving that [s]he exhausted state court remedies or that exhaustion would have been futile."  Id. (internal citations omitted).  Parnell effectively concedes that she did not exhaust her Indian-country jurisdiction claim and does not argue that exhaustion would have been futile.  Rather, she contends that she should not be required to exhaust that claim by presenting it "to a state court lacking jurisdiction over her case."  Dkt. # 24, at 11.  But this argument lacks merit because § 2254(b)(1)'s exhaustion requirement contains no exception for claims alleging an absence of jurisdiction in the convicting court.  See Blanket v. Watkins, 44 F. App'x 350, 351 (10th Cir. 2002) ("[The petitioner's] proffered reason for not exhausting—that the State . . . lacks jurisdiction over these claims—lacks merit."); McDaniel v. Nunn, 601 F. Supp. 3d 1085, 1090 (N.D. Okla. 2022) ("[T]he AEDPA's exhaustion requirement does not carve out an exception for claims alleging the petitioner was prosecuted in a court that lacked jurisdiction."); Largent v. Nunn, No. CIV-20-683-

J, 2020 WL 6734673, at *2 (W.D. Okla. Oct. 20, 2020) (collecting cases), adopted, 2020 WL

673112 (W.D. Okla. Nov. 16, 2020) (unpublished).[6]

In sum, the Indian-country jurisdiction claim is unexhausted and a state remedy—namely,

an out-of-time postconviction appeal—appears to be available to Parnell.  Nonetheless, dismissing

the petition so that Parnell may return to state court to exhaust that remedy would only create false

hope for future federal habeas relief because, as discussed next, the applicable one-year statute of

limitations bars federal habeas relief as to the Indian-country jurisdiction claim.

## II.    Statute of limitations

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), state prisoners have

one year from the latest of four triggering events in which to file a federal habeas petition.  28

U.S.C. § 2244(d)(1).  These events include:

> (A)    the date on which the judgment became final by the conclusion of direct
> review or the expiration of the time for seeking such review;
>
> (B)    the date on which the impediment to filing an application created by State
> action in violation of the Constitution or laws of the United States is removed, if
> the applicant was prevented from filing by such State action;
>
> (C)    the date on which the constitutional right asserted was initially recognized
> by the Supreme Court, if the right has been newly recognized by the Supreme Court
> and made retroactively applicable to cases on collateral review; or
>
> (D)    the date on which the factual predicate of the claim or claims presented
> could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).  The one-year limitation period generally runs from the date the

judgment became "final" under § 2244(d)(1)(A), unless the petitioner alleges facts that implicate

a later commencement date under § 2244(d)(1)(B), (C), or (D).  See Preston v. Gibson, 234 F.3d

---

[6] The Court cites all unpublished decisions herein as persuasive authority.  FED. R. APP. P.
32.1(a); 10th Cir. R. 32.1(A).

1118, 1120 (10th Cir. 2000). Under 28 U.S.C. § 2244(d)(2), the limitation period is statutorily tolled during the pendency of any "properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim." 28 U.S.C. § 2244(d)(2). This statutory tolling provision, however, does not apply to state petitions for postconviction relief or other collateral review that are filed beyond the one-year limitation period prescribed by the AEDPA. Clark v. Oklahoma, 468 F.3d 711, 714 (10th Cir. 2006). In some circumstances, a federal court may toll the one-year limitation period for equitable reasons. Holland v. Florida, 560 U.S. 631, 649 (2010). But equitable tolling "is only available when an inmate diligently pursues his claims and demonstrates that the failure to timely file was caused by extraordinary circumstances beyond his control." Marsh v. Soares, 223 F.3d 1217, 1220 (10th Cir. 2000). In rare circumstances, a habeas petitioner can overcome the untimeliness of a constitutional claim by presenting a credible claim of actual innocence. Perkins, 569 U.S. at 392. This equitable exception, however, applies "to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" Id. at 395 (alteration in original) (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)).

**A.      The Indian-country jurisdiction claim is untimely.**

Parnell acknowledges that she did not file her petition within one year of the date her conviction became final, but she asserts that the petition should be deemed timely for two reasons. First, she contends that, with the benefit of statutory tolling, she filed the petition within one year of the McGirt decision. Dkt. # 2, at 20. She does not, however, expressly invoke 28 U.S.C. § 2244(d)(1)(B), (C), or (D) to support this contention. Id. To the extent Parnell argues that McGirt announced a new constitutional right for purposes of § 2244(d)(1)(C), the Tenth Circuit rejected that proposition in Pacheco v. Habti, 62 F.4th 1233, 1246 (10th Cir. 2023). Second,

Parnell argues that, while other due process violations may be subject to the AEDPA's statute of limitations, due process claims alleging an absence of jurisdiction in the convicting court are not. Dkt. # 24, at 5-8.  But this argument too has been rejected.  See Pacheco, 62 F.4th at 1245 (noting in relation to 28 U.S.C. § 2255(f) that "[w]hen Congress enacted the limitations period in AEDPA, it discerned no reason to provide a blanket exception for jurisdictional claims"); Murrell v. Crow, 793 F. App'x 675, 679 (10th Cir. 2019) (holding that, "as with any other habeas claim," the petitioner's claim that the trial court lacked jurisdiction to accept his plea was "subject to dismissal for untimeliness" (alteration and internal quotation marks omitted)).  Because Parnell has not shown otherwise, § 2244(d)(1)(A) provides the applicable one-year limitation period.

And, applying § 2244(d)(1)(A) shows that the petition is untimely.  The OCCA affirmed Parnell's judgment and sentence on August 13, 2010, and Parnell's judgment became final when the deadline to file a petition for a writ of certiorari with the Supreme Court expired on November 12, 2010.[7]  Parnell's one-year limitation period began to run the following day, on November 13, 2010, and expired one year later, on November 13, 2011.  See Harris v. Dinwiddie, 642 F.3d 902, 906 n.6 (10th Cir. 2011).  Parnell cannot benefit from statutory tolling because she first applied for postconviction or other collateral review in 2016, and first asserted her Indian-country jurisdiction claim in 2017.  Dkt. ## 21-6, 21-9; Clark, 468 F.3d at 714.  And equitable tolling is not warranted because nothing in Parnell's submissions indicates either that she diligently pursued the Indian-country jurisdiction claim or that extraordinary circumstances prevented her from filing a federal habeas petition to assert that claim.  See Yang v. Archuleta, 525 F.3d 925, 928 (10th Cir.

---

[7] Parnell was afforded 90 days from the OCCA's determination in which to file a petition for a writ of certiorari with the Supreme Court.  See 28 U.S.C. § 2101.  Ninety days from August 13, 2010, however, fell on November 11, 2010, Veteran's Day.  Parnell's deadline, therefore, was extended an additional day to November 12, 2010.  FED. R. CIV. P. 6(a)(1)(C); SUP. CT. R. 30(1).

2008) ("An inmate bears a strong burden to show specific facts to support his claim of extraordinary circumstances and due diligence." (alteration and internal quotation marks omitted)).

Thus, as Parnell appears to acknowledge, her only avenue to avoid dismissal based on the statute of limitations is to convincingly show that she is actually innocent. Dkt. # 2, at 16-20.

### B.    The actual innocence claim does not permit review of the untimely claim.

"[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass" despite the "expiration of the statute of limitations." Perkins, 569 U.S. at 386. But "tenable actual innocence gateway pleas are rare." Id.  "To be credible, a claim of actual innocence requires a petitioner to present 'new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.'" Fontenot v. Crow, 4 F.4th 982, 1031 (10th Cir. 2021) (quoting Schlup, 513 U.S. at 324), cert. denied, 142 S. Ct. 2777 (2022).  The gateway should not open unless the petitioner "persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find [her] guilty beyond a reasonable doubt." Perkins, 569 U.S. at 386 (quoting Schlup, 513 U.S. at 329).  This standard, however, "does not demand conclusive proof of exoneration." Fontenot, 4 F.4th at 1035.  Rather, in determining whether a petitioner has satisfied Schlup's demanding standard, the district court must make "a holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard." House, 547 U.S. at 539 (internal citation and quotation marks omitted); see also Fontenot, 4 F.4th at 1035 (explaining that assessment of an actual innocence claim "involves a probabilistic determination that, in light of all the evidence—'old and new; admissible and inadmissible'—'more likely than not any reasonable juror would have reasonable doubt.'" (internal citation omitted) (first quoting Case v. Hatch, 731 F.3d 1015, 1036 (10th Cir. 2013), then quoting House, 547 U.S. at 538)).  And, while a petitioner

asserting her actual innocence need not show diligence in pursuing an actual innocence claim, "[u]nexplained delay in presenting new evidence bears on the determination" of "whether actual innocence has been convincingly shown."  Perkins, 569 U.S. at 399.

Parnell contends that newly discovered evidence—namely, the findings and conclusions of Dr. Roland Auer "that [S.R.'s] death was caused by natural causes independent of any actions of Ms. Parnell"—shows that she "is actually innocent." Dkt. # 2, at 17; Dkt. # 24, at 8-11; Dkt. # 31 (Dr. Auer's report).  Because this Court must consider "all of the evidence," old and new, to determine whether "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," Fontenot, 4 F.4th at 1030, 1035, the Court first discusses the evidence that was presented at trial, then discusses Parnell's newly discovered evidence, and, finally, considers the "likely effect" that new evidence would have had on reasonable jurors, House, 547 U.S. at 539.

### 1.    Evidence presented at trial[8]

#### a.    Months and days leading up to S.R.'s medical emergency

S.R.'s father, R.R., began dating Parnell in November 2007.  Dkt. # 33-8, Tr. Trial vol. II of IV, at 104-09 [401-06].  In December 2007, R.R. and S.R. lived in Tulsa with R.R.'s mother,[9] and R.R. mainly relied on his sister-in-law to provide care for S.R. while R.R. worked during the day.  Id. at 107-08 [404-05]; Dkt. # 33-10, Tr. Trial vol. III of IV, at 79-80 [641-42].  By January 2008, R.R. and Parnell were living together—first at R.R.'s mother's apartment, then at Parnell's

---

[8] Each party provided the Court with a statement of facts.  Dkt. # 2, at 4-9; Dkt. # 21, at 11-17.  In this section of the opinion and order, the Court adopts some facts from each summary and draws other facts from its independent review of the trial transcripts and trial exhibits.

[9] Because R.R.'s mother has the same initials as the minor victim in this case, the Court refers to her as R.R.'s mother rather than by her initials.

mother's house in Jenks[10]—and Parnell began babysitting S.R. on a regular basis. Dkt. # 33-8, at 104-10 [401-07]. R.R. testified that up until February 2008, he had not noticed S.R. having any broken bones or unexplained bruises. Id. at 110 [407]. R.R.'s mother testified that she saw S.R. every day from the time he was about six months old until November 2007 and never noticed unusual bruising, broken bones, or unexplained injuries. Dkt. # 33-10, at 76-78 [638-40]. R.R.'s mother further testified that she noticed no changes in S.R.'s behavior or any unexplained injuries when R.R. and S.R. moved in with her in December 2007. Id. at 80 [642].

On Friday, February 15, 2008, Parnell watched S.R. during the day while R.R. worked. Id. at 114 [411]. R.R.'s mother testified that R.R. and S.R. spent the night at her house that Friday, that R.R. and S.R. left around noon on Saturday, and that R.R. called about 30 minutes later and asked if he could bring S.R. back to the apartment because S.R. "wouldn't stop crying." Id. at 84-86 [646-48]. S.R. stayed the night with R.R.'s mother on Saturday. Id. at 86 [648]. On Sunday morning, S.R. "hollered" when R.R.'s mother lifted his arm to change his shirt. Id. at 87 [649]. R.R.'s mother called R.R. and told him to take S.R. to the emergency room to see if there was something wrong with S.R.'s arm. Id.; Dkt. # 33-8, at 110-13 [407-13]. R.R.'s mother testified that she did not do anything to hurt S.R.'s arm, that she did not see S.R. fall while he was with her, and that when S.R. and R.R. were at the apartment together, she did not see R.R. do anything to hurt S.R.'s arm. Id. at 87-88 [649-50]. R.R. and Parnell picked S.R. up from R.R.'s mother's apartment and took him to an urgent care center. Id. at 88-89 [650-51]; Dkt. # 33-8, at 110-11 [407-08]. Dr. Steven Nussbaum, the doctor who treated S.R. at the urgent care center, testified

---

[10] In some parts of the transcripts, witnesses refer to Parnell's mother, Nina Fries, as Parnell's grandmother. Fries testified that she is Parnell's biological grandmother, but she legally adopted Parnell when Parnell was very young. Dkt. # 33-13, Tr. Trial vol. IV of IV, at 84-85 [938-39]. For ease of discussion, the Court refers to Fries as Parnell's mother.

that S.R. had an "impacted fracture of his proximal humerus," and that this type of injury was commonly seen in elderly women but atypical for a toddler. Dkt. # 33-10, at 105-12 [667-74]. R.R. testified that he did not jerk S.R. by the arm or otherwise cause the fracture, that he did not recall seeing S.R. fall on his arm, and that Parnell told R.R. she did not recall seeing S.R. fall on his arm before they discovered that he was hurt. Dkt. # 33-8, at 118 [415]; Dkt. # 33-9, Tr. Trial vol. II of IV, at 77 [514].

In March 2008, R.R. and S.R. lived in Jenks with Parnell, Parnell's five-year-old son, W.P., and Parnell's mother. Dkt. # 33-8, at 120 [417]; Dkt. # 33-13, Tr. Trial vol. IV of IV, at 84-88 [938-42]. R.R. worked during the day, Monday through Friday, and began taking night classes on Tuesdays, Wednesdays, and Thursdays, so Parnell, who worked part-time, was S.R.'s primary caregiver. Dkt. # 33-8, at 123-25 [420-22]. On March 23, 2008, the Sunday before he died, R.R. was watching television when he heard a loud "thump." Parnell, who was bathing S.R., told R.R. that S.R. fell in the bathtub and hit his head, and R.R. saw that S.R. had a "big knot" and "big bruise" on his forehead. Id. at 121-26 [418-23]; Dkt. # 34 (State's Exhibit 40).[11] During the week leading up to his death, R.R. and Parnell gave S.R. antibiotics to treat an ear infection. Dkt. # 33-8, at 138 [435]; Dkt. # 34 (State's Exhibit 40).

On Tuesday, March 25, 2008, Parnell asked her friend, D.J. Gibbs, to babysit S.R. because S.R. could not go to daycare with "pink eye and some other cold," and Parnell was scheduled to work during the day. Dkt. # 33-8, at 138-39 [435-36]; Dkt. # 33-10, at 116-17 [678-79]; Dkt. # 33-11, Tr. Trial vol. III of IV, at 4 [687]. Gibbs testified that when he arrived at Parnell's house

---

[11] Parnell did not testify at trial, but the jury heard audiotapes of three interviews of Parnell by Detective Darren Carlock and Corporal Jason Smith. Dkt. # 34 (State's Exhibits 39, 40, 41). The Court therefore discusses Parnell's interview statements and the statements made by the officers during the interview as evidence presented at trial.

around 10:30 a.m., Parnell told Gibbs she had given S.R. some medicine and told Gibbs where to find S.R.'s sippy cup.  Dkt. # 33-11, at 6-7 [689-90].  At some point, Gibbs walked to the room where S.R. was lying in his playpen and gave S.R. the sippy cup.  Id. at 8 [691].  Gibbs testified that S.R. appeared to be "a little sleepy."  Id.  Gibbs watched television in the living room, talked on his phone, and checked on S.R. "[a]bout every 30 minutes to an hour" until Parnell returned from work around 1:00 p.m.  Id. at 9 [692].  Gibbs testified that when Parnell returned from work, she cleaned and dressed S.R., and S.R. walked into the living room and smiled at Gibbs before laying his head against the recliner where Gibbs was sitting.  Id. at 10-12 [693-95].  Shortly after Parnell placed S.R. in a highchair, Gibbs saw S.R. "swaying back and forth" in the chair and saw S.R. vomit.  Id. at 12 [695].  Gibbs testified that Parnell cleaned up the vomit and that she told Gibbs that S.R. "would be all right" and "that she would take him to the doctor."[12]  Id.  Shortly thereafter, Gibbs left Parnell's house.  Id.

On Wednesday, March 26, 2008, Parnell either called or sent Gibbs a text message, asking him to babysit S.R. again, but Gibbs did not respond.  Id. at 13 [696].  So, Parnell stayed home from work to watch S.R.  Dkt. # 33-8, at 137-38 [434-36].  According to Parnell, she was with S.R. every minute on Wednesday, they played outside for a few minutes, S.R. ate but appeared to be tired from his earache, and nothing unusual occurred that day.  Dkt. # 34 (State's Exhibit 39).  R.R. testified that S.R. was napping when R.R. came home from work.  Dkt. # 33-8, at 137-39 [434-36].  R.R. ate and left for night school.  Id.  According to Parnell, S.R. appeared to be tired and "wanted to lean" on W.P. around 3:30 p.m. when W.P. got home from school.  Dkt. # 34, (State's Exhibit 40).  Parnell fed S.R. and W.P. dinner around 6:30 p.m.  Dkt. # 34 (State's Exhibits

---

[12] Nothing in the record suggests that Parnell took S.R. to a doctor between March 25, 2008, and March 27, 2008, the day he stopped breathing and was taken to the hospital by ambulance.

39, 40). Parnell's mother took Parnell and the boys to the grocery store and Parnell's mother watched the boys play in the living room while Parnell made cupcakes around 8:30 p.m. Id.; Dkt. # 33-13, at 97-98 [951-52]. Parnell's mother testified that S.R. had been "sleeping a lot," that she saw S.R. vomit once or twice in the dining room on Wednesday evening and that, at some point, S.R. laid his head on W.P.'s shoulder. Dkt. # 33-13, at 97 [951], 99-100 [953-54]. Parnell's mother also testified that S.R. was choking on some food a couple of nights before Wednesday, and Parnell "hit" S.R. on the back and "squeezed" S.R. to dislodge the food. Dkt. # 33-14, Tr. Trial vol. IV of IV, at 8 [980], 12 [984]. According to Parnell, S.R. was falling asleep in his chair on Wednesday evening, and she gave S.R. antibiotics sometime before putting him to bed. Dkt. # 34 (State's Exhibit 40). R.R. called Parnell around 8:30 p.m., while he was between classes, spoke with Parnell, and engaged in "baby talk" with S.R. Dkt. # 33-8, at 140 [437]; Dkt. # 33-9, at 1 [438]. Sometime thereafter, Parnell put S.R. to bed with a sippy cup and gave W.P. a bath. Dkt. # 34 (State's Exhibits 39, 40). When R.R. returned home from school, around 9:30 p.m., S.R. was "in bed" and Parnell was in her room watching television. Dkt. # 33-9, at 2-3 [439-40]. Parnell's mother testified that she heard "something," "maybe" around 10:00 p.m., and told R.R. that S.R. was vomiting. Dkt. # 33-13, at 106-09 [960-63]. Parnell and R.R. went to sleep sometime between 11:30 p.m. and midnight. Id. at 5 [442]. R.R. testified that, ordinarily, and on the night of March 26, 2008, he and Parnell slept in Parnell's room, S.R. slept in a playpen in a different room, and W.P. slept in the same room as Parnell's mother. Id. at 5-6 [442-43].

Possibly around midnight, on Thursday, March 27, 2008, Parnell's mother heard S.R. "crying" or "whimpering," then she walked into the living room and saw Parnell in the recliner rocking S.R. to sleep. Dkt. # 33-13, at 111-15 [965-69]. Parnell's mother returned to her bedroom, where W.P. was sleeping, and may have dozed off. Id. at 115 [969]. Sometime later, Parnell's

mother walked by the hall bathroom, saw R.R. in the bathroom, and walked to the living room where she sat down and "worked some cross-word puzzles" before returning to bed. Id. at 116-17 [ 970-71].   Parnell's mother testified that, after she went back to bed, she "heard something like S.R. was hitting the side of his bed or something."   Id. at 117 [971].   She explained that S.R. "would try to climb out and he would hit like the side" of the playpen. Id.   After that, Parnell's mother heard R.R. tell S.R. to "get to sleep." Id. at 117-18 [971-72].

R.R. testified that he got out of bed around 5:30 a.m. to use the bathroom and "heard S.R. awake" and "making noises, talking or whatever it was." Dkt. # 33-9, at 6-8 [443-45].  R.R. went in to S.R.'s room and saw S.R. lying on his side in the playpen.  Id. at 7.  R.R. testified that S.R. "looked up" at him and "was wide-eyed," so R.R. patted him on the head and back, told him to go to sleep, and returned to bed.  Id. at 7-11.  R.R. testified that S.R. was able to focus on R.R. when S.R. looked at him and that S.R. appeared to be okay with no apparent injuries.  Id. at 11 [448], 13 [450].  R.R. responded, "No," when the prosecutor asked whether R.R. "picked [S.R.] up and bashed his head into anything" before returning to bed.  Id. at 13-14 [450-51].  When R.R. returned to bed, Parnell was getting up to use the bathroom, R.R. heard S.R. "start crying," "[l]ike he wanted to be changed" or "needed something," and Parnell told R.R. that she would attend to S.R.  Id. at 14-16 [451-53].  R.R. testified he was "half asleep a little bit," but "[a]t some point" after Parnell left the room, he heard S.R. "stop crying."  Id. at 15-16 [452-53].  "Then all of a sudden," R.R. heard Parnell "screaming at the top of her lungs, 'Oh my, God.'"  Id. at 16 [453].  R.R. jumped out of bed and met Parnell in the doorway of their room.  Id.  R.R. testified that Parnell was carrying S.R., and he described S.R. as "blue" and "limp" with his eyes "kind of rolled in the back of his head."  Id. at 17 [454].  Parnell either told R.R. to call 911 or made the call herself, and R.R. laid S.R. down on the bed and began performing CPR.  Id. at 17-18 [454-55].  According to R.R., S.R.

16

had "phlegm and mucus coming out of his mouth," and appeared to have "fluid in his lungs." Id. at 18, 20 [455, 457].  At some point, R.R. began vomiting due to the mucus that S.R. was discharging, so Parnell performed CPR while speaking with the 911 operator.  Id. at 22-29 [459-66].  Parnell's mother testified that she was in her bedroom when she heard Parnell "calling an ambulance."  Dkt. # 33-13, at 118 [972].

### b.      First responders

When first responders arrived at Parnell's home, the first firefighter to enter the home, Kyle Flora, saw Parnell performing CPR.  Dkt. # 33-8, at 42-48 [339-45].  Flora testified that S.R. was wearing a freshly changed diaper, had his sweatpants pulled down to around his knees, and appeared "cyanotic," or "blue."  Id. at 49-50 [346-47].  Flora testified that Parnell left the room when he arrived, and that R.R. appeared "very excited" and was "pacing."  Id. at 46-48 [343-45], 52 [349].  Flora observed that S.R.'s "chest was congested" and noted that S.R. discharged "brown-greenish kind of mucus" when he was intubated.  Id. at 53 [350].  Flora's partner, Captain Doug Wyer, entered the home after Flora.  Id. at 22-24 [319-21].  Wyer testified that he saw Parnell in the hallway and that she pointed toward the room when he asked where the baby was.  Id.  Wyer also testified that Parnell stated that "it wasn't her baby," so he did not to ask her any further questions.  Id. at 26 [323].  Wyer testified that it appeared to him as if Parnell thought S.R.'s emergency was "no big deal," and he testified that Parnell may have been outside smoking a cigarette before the ambulance left the house, but he saw R.R. "flipping out" and "trying to help." Id. at 26-27 [323-24], 30-39 [327-36].  Wyer also testified that S.R. was wearing a freshly changed diaper.  Id. at 30-39 [327-36].

Joshua Krumm, the first paramedic who arrived on scene, saw Flora performing CPR, reassessed S.R.'s condition, and observed that S.R. was not breathing and barely had a pulse.  Dkt.

# 33-8, at 60-64 [357-61].  Krumm testified that he administered two doses of epinephrine, within a span of three to four minutes, to increase S.R.'s heart rate before loading him into the ambulance and administered two additional doses of epinephrine after loading him into the ambulance.  Id. at 67-69 [364-66].  Krumm testified that S.R.'s pupils were dilated and non-reactive to light both before S.R. was intubated and while he was being transported to the hospital.  Id. at 71-72 [368-69].  Krumm testified that he wrote in his report that R.R. told Krumm that S.R. went limp and quit breathing in R.R.'s arms when R.R. was trying to get S.R. to sleep.  Id. at 75-76 [372-73].

Corporal Eric Bowdle, with the Jenks Police Department, arrived at Parnell's house and saw Flora and Wyer "working on [S.R.] on the floor."  Id. at 4-6 [301-03].  Bowdle testified that Parnell and R.R. both appeared "very calm" or "fairly calm" when he and Sergeant Gordon spoke with them, but also testified that he saw Parnell vomiting in the bathroom.  Id. at 13-16 [310-13], 20 [317].  Bowdle testified that he wrote in his report that R.R. told Bowdle that R.R. found S.R. unconscious.  Id. at 20 [317].  Bowdle saw Parnell's mother in the hallway at some point.  Id. at 21 [318].  Bowdle testified that W.P. was asleep while the ambulance was at Parnell's house.  Id.

### c.   Hospitalization and investigation

S.R. was transported by ambulance and admitted to St. Francis Children's Hospital in Tulsa ("St. Francis") on Thursday, March 27, 2008.  Dkt. # 33-9, at 33-34 [470-71].  R.R. and Parnell drove to the hospital.  Id.  R.R. testified that as he drove to the hospital, he asked Parnell

> what happened and she just said that, you know, she went into the bedroom that [S.R.] was standing up with his arms up, wanting her to pick him up.  So she did and she rocked him back asleep.  She laid him down, went and got a drink of water, heard a noise.  She went in there and she found him limp and unresponsive, blue.

Id.  After R.R. and Parnell arrived at the hospital, they sat in the waiting room with other members of their respective families.  Id. at 35 [472].  At some point, law enforcement officers asked R.R. and Parnell to provide written statements.  Id.  R.R. testified that he described in his written

18

statement not only what he did but also the sequence of events that Parnell told him about on the way to the hospital.  Id. at 39-40 [479-77].  Ultimately, doctors informed R.R. that S.R. had a fractured skull, and that he was in "[b]ad condition."  Id. at 41-43 [478-480].  R.R. testified that he was in shock about S.R.'s injuries and "wonder[ed] how it could have happened" because neither he nor Parnell could remember seeing S.R. fall.  Id.  R.R. testified that he remained in the pediatric intensive care unit with S.R., that Parnell "was there off and on," and that he did not see Parnell in that unit "the whole time" because she "was walking through the hospital."  Id. at 52-53 [489-90].  At some point, R.R. spoke with Parnell near the hospital's chapel.  Id. at 54 [491].  R.R. testified that Parnell was "really upset [and] crying" because "[t]hey had taken [W.P.] out of school and he was in the custody of DHS."  Id.  R.R. testified that while he was at the hospital he was "thinking all kinds of things" and "thinking, you know, maybe [S.R.] fell, something previously the day before and just took a couple of days to take effect."  Id. at 55 [492].

Sometime before 11:00 a.m., Dr. Barton, the pediatric intensive care unit doctor caring for S.R., contacted Dr. Sarah Passmore, a pediatrician with a subspecialty in child abuse pediatrics, told Dr. Passmore that S.R. had a skull fracture, and asked Dr. Passmore if she would examine S.R. to "determine if one of the diagnoses would be child abuse."  Dkt. # 33-16, Tr. Trial vol. V of VI, at 38-51 [163-76], 56 [181], 110 [234].  Dr. Passmore spoke with R.R. and Parnell, reviewed S.R.'s CT scan, and conducted a limited physical examination of S.R.  Id. at 51-66 [176-90].  Based on her observations, her review of the medical records, and the information she obtained from R.R. and Parnell, Dr. Passmore concluded that S.R.'s injuries most likely resulted from child abuse.  Id. at 90 [214].

Corporal Jason Smith, with the Jenks Police Department, was assigned as the lead detective sometime after doctors determined that S.R. had a skull fracture.  Dkt. # 33-14, at 14-15 [986-87];

26-27 [998-99].  Corporal Smith took photographs of S.R.'s injuries and observed what Smith described as an oddly shaped bruise on S.R.'s back.  Id. at 28-33 [1000-05].  Sometime after he spoke with Dr. Barton and learned the extent of S.R.'s injuries, Smith conducted informal, unrecorded interviews with Parnell and R.R.  Id. at 36-42 [1008-14].  Smith then contacted Detective Darren Carlock, with the Tulsa Police Department's Child Crisis Unit, and asked him to assist with the investigation.  Id.; Dkt. # 33-11, at 29-30 [712-13], 46-48 [729-31].  Detective Carlock and Corporal Smith went to St. Francis, spoke with Dr. Barton, and interviewed Parnell and R.R, separately, around 3:00 p.m.  Dkt. # 33-11, at 49-52 [732-35].  Later that evening, around 8:30 p.m., Carlock and Smith interviewed Parnell and R.R., separately, a second time, and interviewed Parnell's mother.  Dkt. # 33-12, at 36 [848], 39 [851].  During the first two audiotaped interviews, Parnell maintained that she did not hit S.R., that she did not know what caused S.R.'s skull fracture, that S.R. was "fine" when she changed his diaper and returned him to his playpen, and that S.R. was in the same position she left him in when she returned from the kitchen five minutes later and discovered that S.R. was not breathing.  Dkt. # 34 (State's Exhibits 39, 40).  In addition, Parnell maintained that she heard nothing suggesting that anyone else went into S.R.'s room after she changed his diaper, that she knew R.R. would not and did not do anything to hurt S.R., and that she had been with S.R. in the days leading up to his head injury and was not aware of any accidental falls, other than his fall in the bathtub.  Dkt. # 34 (State's Exhibits 39, 40).  During the second interview, Parnell expressed confusion and frustration with the various time frames suggested by doctors, stating that first she was told the injury could have occurred twelve to twenty-four hours before S.R. stopped breathing, then six to seven hours before he stopped breathing, then only minutes before he stopped breathing.  Dkt. # 34 (State's Exhibit 40).  At one point Parnell referenced S.R.'s sleepiness and vomiting and asked whether S.R. could have been

injured then developed worsening symptoms over a couple of days, and Detective Carlock emphatically rejected that notion, stating, "Hell, no." Id. Parnell then stated that even if she thought back to three days before S.R. stopped breathing, the only accident she could recall was S.R.'s fall in the bathtub. Id. Detective Carlock described Parnell's demeanor during the first two interviews as "[e]motional, upset, unable to – unable to explain what happened." Dkt. # 33-13, at 10-11 [864-65]. He testified that his understanding from speaking with the doctors about S.R.'s injuries and condition was that the skull fracture "had happened shortly before S.R. was found unresponsive." Id. at 7 [861].

On Friday morning, March 28, 2008, Jayna Mayer, a forensic interviewer with the Child Abuse Network, interviewed Parnell's five-year-old son, W.P. Dkt. # 33-10, at 24-33 [586-95]; Dkt. # 33-13, at 19 [873]. The state introduced at trial the videotape of W.P.'s forensic interview. Id. at 37-38 [599-600]. W.P. spoke softly throughout most of the interview, but told Mayer that Parnell gets mad at S.R. because S.R. cries a lot, that Parnell yells at S.R. for crying, and that S.R. had a bruise on his back because Parnell "accidentally punched" S.R. in the back and scratched S.R.'s knee. Dkt. # 34 (State's Exhibit 37). When Mayer asked W.P. if S.R. did anything when Parnell punched him, W.P. demonstrated by holding his arms together and curving his back as if to block a punch. Id. W.P. told Mayer that Parnell sometimes punches holes in walls, that Parnell and R.R. never punched W.P., and that R.R. never punched S.R. Dkt. # 34 (State's Exhibit 37). W.P. also told Mayer that R.R. held S.R. then put him down to sleep. Id. W.P. told Mayer he was asleep when the ambulance came and took S.R. to the hospital, that R.R. was crying and trying to wake the baby up when the police came, and that Parnell either punched a hole in the wall when S.R. went to the hospital or punched a hole in the wall when she punched S.R. Id. On cross-examination, Mayer testified that W.P.'s statements describing what may have happened when he

was asleep made it "very likely that somebody had spoken to [W.P.] before the interview."  Dkt. # 33-10, at 56-60 [618-22].  Mayer also agreed with defense counsel that several of her questions during the interview were improperly suggestive—particularly the line of questioning that resulted in W.P.'s statement that Parnell punches when she is mad.  Id. at 61-68 [623-30].[13]

S.R. died around 1:00 p.m. on Friday, March 28, 2008, when doctors removed him from life support.  Dkt. # 33-9, at 58 [495].  Detective Carlock and Corporal Smith interviewed Parnell a third time about thirty minutes after S.R. was removed from life support.  At the beginning of the audiotaped interview, Parnell can be heard breathing heavily for several minutes, as if she were hyperventilating, and repeatedly struggling to say, "I need [R.R.]."  Dkt. # 34 (State's Exhibit 41).  After this portion of the third interview was played for the jury, Detective Carlock testified that he saw "no tears," that Parnell "had her hands contorted and cramped back," and that she appeared to be exhibiting "fake emotion" because her demeanor changed quickly after R.R. joined them in the interview room.  Dkt. # 33-13, at 15-17 [869-71].  During this interview, Carlock confronted Parnell with some of W.P.'s interview statements.  Dkt. # 34 (State's Exhibit 41).  Parnell admitted that she yelled at S.R., but adamantly denied that she hit or punched him.  Id.  Throughout several minutes of the third interview, Parnell repeatedly told R.R. that he had to believe her when she said she never hit S.R.  Id.  Parnell also maintained that she knew that neither she nor R.R. caused S.R.'s skull fracture.  Id.  Carlock testified that "it made no sense" to him that Parnell would keep saying that R.R. should believe that she did not hurt S.R. because, in Carlock's view, if Parnell did not hurt S.R., then R.R. did.  Dkt. # 33-13, at 24-25 [878-79].

---

[13] The state presented photographs of a hole in the wall of Parnell's house.  Dkt. # 33-27, at 14-15 (State's Exhibits 11 through 14).  Parnell's mother testified that the hole had been there for over two years and that Parnell made the hole with a broom when she was cleaning lint from a vent in the hallway.  Dkt. # 33-14, at 7 [979], 11-12 [983-84].

#### d.      Testimony of family and friends

R.R.'s mother testified that she saw S.R. several times a week between mid-February and March 27, 2008, after R.R. and S.R. moved to Jenks with Parnell.  Dkt. # 33-10, at 89 [651].  R.R.'s mother noticed no changes in S.R.'s behavior during that time and testified that S.R. appeared to be happy when he saw her.  Id.  R.R.'s mother testified that during that same period she observed interactions between S.R. and R.R. and between S.R. and Parnell.  Id. at 90 [652].  According to R.R.'s mother, R.R. "loved on [S.R.] [and] played with him all the time," whereas Parnell "would try to get him - - S.R. to play with her [but] he wouldn't."  Id.  R.R.'s mother also testified that, during the time from S.R.'s birth until his death, she did not notice any unexplained bruising and the only unexplained accident she was aware of occurred when he fractured his arm in February 2008.  Id. at 96-97 [658-59].

Parnell's mother testified that S.R. "cried a lot" when R.R. was around, that R.R. would not allow her to hold S.R. because R.R. thought S.R. would be "spoil[ed]," that R.R. "cussed" and "yelled" at S.R., and that she did not see anybody spank S.R.  Id. at 98-99 [952-53], 114 [968]; Dkt. # 33-14, at 2-3 [974-75], 8 [980].  W.P. testified at trial that he had never seen Parnell hurt S.R.  Dkt. # 33-17, Tr. Trial vol. VI of VI, at 5 [263].  Parnell's sister testified that she witnessed several concerning interactions between R.R. and S.R. between January 2008 and S.R.'s death in March 2008.  Id. at 13-17 [271-75].  Specifically, she heard R.R. tell S.R. to "shut the fuck up" or "knock that shit off" when S.R. cried, that she saw R.R. spank S.R. for crying "[m]any times," and that it "made [R.R.] mad" when she visited Parnell's house and S.R. would try to leave with her.  Id.  Parnell's sister also testified that, in January 2008, she saw R.R. picked up S.R. by the arm and throw S.R. on the couch.  Id.  Parnell's sister testified that she did not report any of these incidents to anyone when they happened, but she did report them to the district attorney's office months

before Parnell's trial, and the prosecuting attorneys did not want to discuss these allegations of abuse.  Id. at 21-34 [279-90].

Parnell's friend, D.J. Gibbs, testified that he and Parnell had been friends for more than a decade, that he did not have frequent contact with R.R. between November 2007 and March 2008, but that he had seen R.R. yell and swear at S.R. for crying and, according to Gibbs, S.R. would appear to tremble when R.R. yelled at him.  Dkt. # 33-11, at 16-19 [699-702].  Gibbs also testified that Parnell appeared to be stressed that she was missing work to care for S.R., and stressed that S.R.'s loud and frequent crying was bothering Parnell's mother.  Id. at 3-4 [686-87], 14-15 [697-98].  Parnell's friend, Joshua Tisdal, testified that on Thanksgiving Day, in November 2007, R.R. and Parnell visited Tisdal's house and R.R. left S.R. in the car alone for nearly thirty minutes while R.R. drank a few beers inside with Tisdal and Parnell.  Dkt. # 33-16, at 118-19 [242-43], 126 [250].

R.R.'s father, who was called by the state as a rebuttal witness, testified that he and S.R. spent Thanksgiving 2007 together, that R.R. left at some point, and that S.R. stayed home and did not leave with R.R.  Dkt. # 33-17, at 72 [328]; Dkt. # 33-18, Tr. Trial vol. VI of VI, at 1-11 [329-39].

### e.      Testimony of expert witnesses

Dr. Andrew Sibley, a board-certified forensic pathologist, performed S.R.'s autopsy on March 29, 2008.  Dkt. # 33-15, at 85-88, 92.  On external examination, Dr. Sibley observed several "relatively small bruises on various portions" of S.R.'s body.  Id. at 94.  He described two small bruises on the left side of the forehead, one small bruise above the left eyebrow, and a larger bruise on the right side of the forehead that appeared to be "somewhat older."  Id.  He also noted small bruises on the right side of the chest, a small bruise on the left arm, a scrape on the right elbow, and "bruising of both knees, which is not uncommon in a toddler."  Id. at 95.  Dr. Sibley testified

that "it would be unusual for a child of [S.R.'s] age not to have any injuries just due to falling and being a kid." Id.  When the prosecutor asked if Dr. Sibley found any "unusual" bruising, Dr. Sibley said he did not and testified that there could be "accidental explanations" for the forehead bruises. Id.  The prosecutor then showed Dr. Sibley photographs that were taken at the hospital, rather than during the autopsy, and Dr. Sibley testified that those photographs depicted "a few small bruises on the left and right sides of the back," "faint bruising on the left side of the head," and "some purple discoloration of the ear" which he could not say was a "bona fide bruise." Id. at 96-99.  Dr. Sibley testified that he did not note any external bruising on the back during the autopsy and that the "settling of blood after death" may have "obscure[d] those injuries." Id. at 100-01.

On internal examination of S.R.'s body, Dr. Sibley observed "four adjacent, small areas of hemorrhage on [S.R.]'s lower back on the left side" and testified that this indicated "some sort of blunt impact" that could be "[c]onsistent with, but certainly not specific for" the impact from a fist.  Dkt. # 33-16, at 33-34 [158-59].  Dr. Sibley observed small areas of bruising under S.R.'s scalp and "a larger area of fresh bleeding on the right and back side of the head." Dkt. # 33-15, at 104.  Underneath the area of fresh bleeding, Dr. Sibley observed a skull fracture that "extend[ed] all the way from the bottom of the skull all the way to the top of the skull, with a branch of that fracture extending leftward into the back of the head." Id.  Dr. Sibley testified that it would take "a significant amount of force" to cause S.R.'s skull fracture and that "the mechanism would be something striking the head one or more times, or the head striking something one or more times." Id. at 103.  Dr. Sibley testified that the lack of external bruising at the fracture site indicated that S.R.'s head struck, or was stricken with, "something with a broad surface." Id.  He further testified that S.R.'s fracture was "[v]ery large," "[v]ery severe," and "one of the biggest ones" he had seen in fifteen years of performing autopsies.  Id. at 109.  More specifically, he testified: "This is the

biggest fracture I've seen in a child that didn't involve a motor vehicle, where either the child was in the motor vehicle or run over by a motor vehicle." Id.

Dr. Sibley described the area of bleeding between the brain and the "dura," i.e., the membrane that covers the brain, as "a thin layer of subdural blood" and explained that "most cases of abusive head trauma do have very thin subdural blood accumulations" "because the brain begins to swell and actually competes with the accumulation of blood so you get a swollen brain and a relatively thin layer of blood accumulation." Id. at 113. Dr. Sibley testified that S.R. had "diffuse brain injury," and explained that the swelling "involve[d] the entire brain." Id. He further testified that "brain swelling begins to occur at the time the injury is inflicted," and that "the degree of swelling progresses at varying rates based on individual variation and based on the severity of the injury itself." Dkt. # 33-16, at 32 [157].

Dr. Sibley did not find any evidence of "internal brain injuries" when he sectioned the brain, but he did find "a moderate amount" of retinal hemorrhaging in both eyes. Dkt. # 33-15, at 115. Dr. Sibley testified that retinal hemorrhages "are classically associated with abusive head trauma" but also "can be caused by CPR or can be caused by diffuse brain swelling from other causes besides abusive head trauma." Id. at 116; see also Dkt. # 33-16, at 9 [134] (noting that retinal hemorrhages are "observed very commonly in abusive head trauma" and "less commonly in other forms of trauma" and further noting that "[n]obody really knows the exact mechanism of retinal hemorrhages, so there's lots of theories out there but nobody knows for sure what causes them"). Lastly, Dr. Sibley noted that S.R. had "diffuse cerebral edema with herniation," explained that herniation occurs when the brain swells and pushes down through "the hole where the spinal cord comes through," and further explained that this type of herniation is "a sign of generally irreversible brain injury." Dkt. # 33-15, at 117.

26

Based on his observations, Dr. Sibley determined that S.R.'s cause of death was "[b]lunt head trauma," specifically, an "impact-related injury to the back of his head" that caused an eight-inch-long skull fracture, diffuse brain swelling, retinal hemorrhaging in both eyes, and subdural hemorrhaging. Dkt. # 33-15, at 101-21.  He determined that the manner of death was a homicide because of the severity of the fracture and the lack of explanation from the caretakers.  Id. at 118 ("[T]here has to be an explanation for an impact that heavy producing a skull fracture that large and brain swelling that severe that resulted in this child to die so quickly. . . .We know it's not natural, we know it's not suicide, so this is a homicide.").  Dr. Sibley further testified that when such a severe impact to the head of a child occurs, "there is generally not any significant lucid interval or period of time where the child is awake and alert and acting normally."  Id. at 121; see also id. at 125 (describing a lucid interval as "a time between when an injury occurs and when symptoms first begin to manifest themselves").  Dr. Sibley opined that, given the severity of S.R.'s injuries, he "would expect loss of consciousness to occur immediately or within a very short period of time."  Id. at 123-24.  He testified that some literature states that "80 percent of children with head injuries show symptoms within an hour" while other literature "say[s] that children who have diffuse brain injury and subsequently die go unconscious virtually immediately."  Id. at 125.  Dr. Sibley testified that "within any kind of research endeavor, we're always talking about a spectrum of levels of injury.  And so we have to determine how severe is this injury."  Dkt. # 33-16, at 1 [126].  He again described S.R.'s injury as a "very severe injury" and testified that "very severe injuries are the ones that are least likely to allow for a lucid interval."  Id.  Dr. Sibley could not "rule out the possibility" that S.R. had a lucid interval, but he opined that if S.R. had a lucid interval "it's very unlikely that it would even be a matter of a few minutes."  Id. at 1-2 [126-27].  Dr. Sibley further opined that even if S.R. did not immediately lose consciousness after the impact that caused

his head injury, "his level of consciousness would be somewhat diminished, where the normal caretaker wouldn't think that everything was normal." Id. at 3 [128].

Dr. Sarah Passmore, a board-certified pediatrician with a subspecialty in child abuse pediatrics, first testified as to her observations when she examined S.R. at St. Francis before his death. Dkt. # 33-16, at 38 [163], 49-51 [174-76], 114 [238]. Before examining S.R., Dr. Passmore was aware that his CT scan indicated a skull fracture and she obtained a medical history from R.R. and Parnell regarding the circumstances that precipitated the 911 call, any recent illnesses S.R. may have had, "any known falls" or "injuries" they were aware of, and S.R.'s past medical history. Id. at 55-56. [180-81]. Dr. Passmore testified she learned from them that S.R. had a broken arm in February 2008 "from a fall" that was "unwitnessed" and heard from "somebody" other than R.R. and Parnell that S.R. had fallen in the bathtub about a week earlier. Id. During her examination of S.R., Dr. Passmore observed that S.R. had multiple bruises on the side of his left ear, as well as scattered bruising across his face and bruising around his eyes. Id. at 57-58 [182-83]. According to Dr. Passmore, the forehead bruise was explained as an injury from the fall in the bathtub, and the bruising around the eyes was unexplained but could have been related to the skull fracture. Id. at 58-59 [183-84]. Dr. Passmore testified that the ear bruising was significant because "that's not a normal location or a location where we see normal childhood bruising." Id. at 59 [184]. She testified "it would take a direct impact or something like that to cause a bruise in the ear." Id. at 60 [185]. Dr. Passmore explained that she would expect a toddler to have some bruises, particularly on the forehead or the shins, because toddlers "are very mobile" and "tend to fall a lot." Id. at 62 [186]. Dr. Passmore also observed circular bruising on S.R.'s back, which she described as consistent with "impact from fingers or knuckles." Id. at 64-65 [188-89] . According

to Dr. Passmore, this too was an unusual location for a bruising on a toddler and she received no "explanation for that bruising." Id. at 63-65 [187-89].

Dr. Passmore also testified as an expert in pediatrics and child abuse pediatrics, offering her opinions based on Dr. Sibley's autopsy findings. Dkt. # 33-16, at 67 [191]. Dr. Passmore opined that S.R. had a "very large" and "severe" skull fracture that was caused by "[b]lunt head trauma" with "either the head hitting a surface or something hitting the surface of the skull." Id. at 68-71 [192-95]. Dr. Passmore noted that S.R. had "a shearing injury," or "diffuse axonal injuries from the acceleration/deceleration that caused the skull fracture." Id. at 75 [199]. Dr. Passmore opined that S.R. likely would have experienced pain upon receiving the injury and would have "start[ed] to show symptoms and then would gradually deteriorate" immediately after the injury. Id. at 76 [200]. She testified that S.R. might not have immediately lost consciousness, and opined that even if he remained conscious, he would not have been "able to have a coherent interaction" with anyone or been able to sit, stand, or raise his arms, and that "any reasonable adult" would have "know[n] something [was] wrong." Id. at 76-77 [200-01], 111 [235]. Dr. Passmore testified she would not expect S.R. to "have a lucid interval where he could behave normally" after the injury and that his symptoms "would likely show within minutes." Id. at 79-80 [203-04]; see also id. at 99 [223] (opining that S.R. "would have likely been symptomatic immediately, but not necessarily unconscious"); id. at 108 [232] ("It's my opinion that symptoms would have been immediate. A number of minutes would have been very reasonable. There would be a range, either - - but the symptom onset would be pretty quick."). Based on her observations and experience, Dr. Passmore opined that that S.R.'s skull fracture resulted from child abuse. Id. at 90 214] ("And part of my opinion that it is child abuse is part of my medical diagnosis. Child abuse is actually a medical diagnosis.").

Dr. Joye Carter, Parnell's expert witness and a board-certified forensic, clinical, and anatomical pathologist, testified that she reviewed S.R.'s medical records, Dr. Sibley's autopsy report, police reports, and some court transcripts.  Dkt. # 33-11, at 63-66 [746-49], 70 [753].  Dr. Carter agreed with Dr. Sibley's finding that S.R.'s injury resulted from "blunt force trauma to the brain," but she disagreed with Dr. Passmore's testimony that S.R. suffered an impact injury, not a diffuse axonal injury or "shearing" injury.  Id. at 75 [758], 113 [796], 118 [801].  She described S.R.'s fracture as an "eight-inch linear branching skull fracture."  Id. at 112 [795].  Dr. Carter opined that even though S.R.'s skull fracture was severe, incapacitation would not be immediate but, rather, could take "about an hour" from the time of injury.  Id. at 72-75 [755-58], 120-25 [803-08].  Dr. Carter further opined that immediately after S.R. was injured, his eyes could have been open, and he may have been able to move for several minutes.  Id. at 74 [757] ("I don't have any reason to say his eyes would not have been open, [or that] he would not have been able to move for several minutes, because you don't have that encroachment of the brain stem at that point."); id. at 78 [761] (explaining "there's a different reaction time from the insult and then the brain swelling that takes place and then the ability to carry on motions").  She explained that S.R.'s skull fracture was the "initiating injury," that the brain swelling, or cerebral edema, was the body's response to that injury, and that "[i]t takes time for swelling to occur and . . . it is the swelling that leads to the irreversible change in the child's brain."  Id. at 72-73 [755-56], 122-23 [805-06].  Dr. Carter testified that "[t]here are many individuals who may receive severe injuries and still be able to carry out some basic functions," and that, in those cases, "[a] lay person may not be able to interpret that something has gone wrong."  Id. at 78 [761].  Dr. Carter opined that it may not have been immediately apparent to anyone that something was wrong with S.R.  Id. at 74 [757].  She also testified that it is "difficult to determine at whose hands [the] injury occurred" because

30

"[n]othing in there is an injury that is going to immediately incapacitate the child."  Id. at 124-25 [807-08].  On cross-examination, Dr. Carter reiterated her opinion that "a child can have minutes, many minutes, an hour more or less, before they react with loss of consciousness and inability to move after receiving an injury such as this."  Dkt. # 33-12, at 4 [816].

###### 2.   Newly discovered evidence

Parnell now submits as new evidence a report prepared in 2022 by Dr. Roland Auer, a board-certified neuropathologist.  Dkt. # 2, at 16-20; Dkt. # 31.[14]  In his report, Dr. Auer indicates that he reviewed microscopic glass slides, autopsy files and photographs, and various records from the criminal investigation, including S.R.'s medical records.  Dkt. # 31, at 1-5.  Dr. Auer states that S.R.'s skull fracture was in the right occipital bone tracking toward the foramen magnum and that "[s]uch a fracture is typical for falling backward."  Dkt. # 31, at 19.  He describes one autopsy photograph as depicting an "occipital bruise" and opines that the bruise resulted from S.R. "falling backward to striking a solid object, probably the ground."  Id.  Dr. Auer states that microscopic examination of S.R.'s lung tissue and evidence of an "increase in blood monocytes" show that S.R. had pneumonia at the time of his death, and Dr. Auer explains that "pneumonia causes hypoxemia, and hypoxemia causes falls."  Id. at 11-13, 25, 35; see also id. at 30-33 (generally discussing pneumonia and viruses and stating that S.R. may have had "a rhinovirus flu-type pneumonia").  Dr. Auer opines that S.R.'s brain swelling may have been attributable to "either hypoxia, a previous fall, or both."  Id. at 35.  Dr. Auer also notes that toddlers generally are susceptible to falls because they have "immature spinocerebellar system[s]," and he appears to opine that S.R.

---

[14] The Court permitted Parnell leave to file Dr. Auer's report under seal.  In discussing the report, the Court describes the substance of Dr. Auer's findings and conclusions in a way that preserves the confidentiality of S.R.'s medical information that is included in the report.  All citations to the report refer to the CM/ECF header pagination.

may have been injured in a "spontaneous fall." <u>Id.</u> at 25-26.  Dr. Auer agrees with Dr. Sibley's finding that S.R. had retinal hemorrhaging, but Dr. Auer opines that hemorrhaging resulted from efforts to resuscitate S.R., including the administration of several doses of epinephrine, not from child abuse.  <u>Id.</u> at 13-16, 33-35.  Dr. Auer also states that skull fractures can be asymptomatic, especially in toddlers, and opines that S.R.'s skull fracture "is expected to be asymptomatic and painless." <u>Id.</u> at 26-27.  Dr. Auer claims that it "has been known for decades" that "lucid intervals occur routinely in pediatric head injury, and that the duration of the lucid interval can be up to seven days." <u>Id.</u> at 26-29.  Dr. Auer further opines that a skull "fracture does not immediately mean consciousness is lost on the spot, because the brain determines loss of consciousness, not absorption of the kinetic energy by a bone." <u>Id.</u> at 35.

### 3.    Analysis

Parnell contends that the state's theory at trial was that Parnell "must have inflicted [S.R.'s] skull fracture because she was the last person who was with [S.R.] before he went limp."  Dkt. # 2, at 18.  From this premise, Parnell argues that Dr. Auer's report "casts significant doubts on the state's case theory" because it demonstrates that the "time frame from injury skull fracture to the loss of consciousness" could have been "a period of days." <u>Id.</u>  "Once it is clear that [S.R.] could have experienced a lengthy lucid interval after his skull was fractured," Parnell argues, "no reasonable juror could find that Ms. Parnell murdered [S.R.] because it would have been far more likely that [S.R.'s] injury was the result of an accidental fall or inflicted by someone else." <u>Id.</u>; <u>see also</u> Dkt. # 24, at 10 ("Dr. Auer's testimony that the skull fracture could have occurred as much as a week earlier would have raised sufficient doubt that no reasonable juror could find Ms. Parnell guilty of murder.").

Respondent contends that Dr. Auer's report does not support a tenable actual innocence claim for three reasons:  (1) Dr. Auer's "theory is entirely cumulative to the testimony of Dr. Carter" and some aspects of Dr. Sibley's testimony; (2) Dr. Auer's report is not "new" evidence because Dr. Auer's report "was available, and could have been presented, at trial"; and (3) even if it is new evidence, considering Dr. Auer's report in light of all evidence does not demonstrate that it is more likely than not that no reasonable juror would have found Parnell guilty beyond a reasonable doubt.  Dkt. # 21, at 22-27.

Preliminarily, the Court rejects respondent's first two contentions.  First, while some of Dr. Auer's testimony might be cumulative, his testimony would not be entirely cumulative because, as Parnell argues, no expert witness testified at trial that S.R. could have experienced a lucid interval of more than one hour and, while there was some evidence presented at trial that S.R. had a "cold" and an "ear infection" in the days leading up to his death, no expert witness suggested that S.R. had pneumonia so severe that it may have contributed to an unwitnessed accidental fall severe enough to fracture his skull.  Dkt. # 24, at 8-11.  Second, as respondent acknowledges, the Tenth Circuit recently held that evidence is "new" for purposes of an actual innocence claim so long as that evidence was not presented at trial.  Dkt. # 21, at 22-23 n.11; Fontenot, 4 F.4th at 1031-34.  Thus, Dr. Auer's report, prepared in 2022, is "new" evidence even assuming Parnell, or her trial counsel, could have obtained and presented the same report at her 2009 trial.

Nonetheless, the Court finds that Parnell has not shown that it is more likely than not that no reasonable juror would have found her guilty beyond a reasonable doubt, after considering the evidence presented at trial and the additional evidence from Dr. Auer's report.  Significantly, Dr. Auer's opinions that S.R.'s skull fracture likely was "asymptomatic" and that S.R. may have experienced a lucid interval for "days" between the injury and his death conflict with the opinion

testimony all three expert witnesses who testified at trial.  Dr. Passmore and Dr. Sibley both described S.R.'s skull fracture as particularly severe and opined that symptoms would exhibit immediately or nearly immediately and that a reasonable caretaker would have recognized that something was wrong with S.R. very soon after he fractured his skull.  Dr. Carter testified that she agreed S.R. would display symptoms of a head injury; her opinion differed only as to timing, as she testified that incapacitation would occur about an hour after the injury, rather than immediately.  Further, while all three expert witnesses testified that S.R.'s brain swelling was a response to the eight-inch-long skull fracture that was caused by an impact-related injury, Dr. Auer's report appears to suggest that, in his opinion, the skull fracture was caused by a spontaneous fall that resulted from a viral infection and that the infection itself might have caused the brain swelling.  The Court finds that a reasonable juror likely would have given less weight to Dr. Auer's opinions when contrasting them with the opinions of all other expert witnesses, and likely would have found petitioner guilty beyond a reasonable doubt.

Further, evidence presented at trial supporting a reasonable juror's finding of guilt exists beyond expert opinions regarding the timing and effects of the skull fracture.  R.R. and R.R.'s mother both testified that S.R. did not experience any unexplained bruising or injuries until Parnell began babysitting him regularly in January 2008, and R.R. testified that Parnell cared for S.R. on February 15, 2008, the day S.R. suffered an unexplained arm fracture that the treating physician described as an atypical toddler injury.  And, while there was conflicting evidence presented at trial regarding whether Parnell or R.R., or both, either verbally or physically abused S.R., the Court finds that a reasonable juror likely would have resolved that conflicting evidence against Parnell.  Notably, Parnell's mother, sister, and friends testified that R.R. was verbally and physically abusive toward S.R.  But Parnell's friends admitted they infrequently witnessed encounters

between R.R. and S.R., one friend's testimony was strongly rebutted by testimony from R.R.'s father, and Parnell's mother and sister admitted that they neither intervened nor reported R.R.'s allegedly abusive behavior to anyone until after Parnell was charged with murder.

In sum, having considered all the evidence, the Court is not persuaded that, "in light of the new evidence, no juror, acting reasonably, would have voted to find [Parnell] guilty beyond a reasonable doubt." Schlup, 513 U.S. at 329.  The actual innocence exception does not, therefore, salvage Parnell's untimely petition.

CONCLUSION

The Court grants respondent's dismissal motion and dismisses the petition as barred by the applicable statute of limitations and, in the alternative, for failure to exhaust state remedies.  In addition, the Court declines to issue a certificate of appealability because the Court finds that reasonable jurists would not debate the procedural dismissal of the petition on either ground.  28 U.S.C. § 2253(c); Slack v. McDaniel, 529 U.S. 473, 484 (2000).

**IT IS THEREFORE ORDERED** that respondent's motion to dismiss (Dkt. # 20) is **granted**.

**IT IS FURTHER ORDERED** that Parnell's petition for writ of habeas corpus (Dkt. # 2) is **dismissed** as barred by the applicable statute of limitations and, in the alternative, for failure to exhaust available state remedies.  A separate judgment of dismissal shall be entered herewith.

**IT IS FURTHER ORDERED** that a certificate of appealability is **denied**.

**DATED** this 22nd day of August, 2023.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE